## DOWNES v. TETER–HEANY DEVELOPING CO.

(Circuit Court, M. D. Pennsylvania. February 23, 1906.   On Rehearing
March 13, 1906.)

No. 1.

PATENTS—INFRINGEMENT—INSULATION OF ELECTRICAL CONDUCTORS.

The Downes patents, Nos. 534,785 and No. 709,001 for an improvement thereon, both covering a process for applying asbestos insulation to electrical conductors and the resulting product, the process consisting in its essential features of brushing or carding the insulating material after it has been glued to the wire to raise a nap, laying it in one direction, and then compressing it to form a mat which is then coated with a waterproof material, construed, and *held* not infringed as to either process or product by the Heany patent, No. 740,131.

In Equity. Suit for infringement of letters patent No. 534,785, granted February 26, 1895, and No. 709,001, granted September 16, 1902, for a process of applying asbestos insulation to electrical conductors, and the resulting product, both issued to Louis W. Downes. On final hearing.

Philip Mauro and Reeve Lewis, for complainant.

Henry E. Everding, for respondents.

ARCHBALD, District Judge.  The issue here is one of infringement. The prior art is resorted to simply to confine the patents sued upon to that which alone, as it is claimed, is new in them. Being so confined, it is conceded that there is nothing there which anticipates them; although, otherwise, it is contended, there would be. Neither is any point made with regard to the processes covered by the patents, that they consist simply of a succession of mechanical steps, which according to some authorities are not supposed to be patentable. Passing all this by, it is confidently asserted by the defendants, that no infringement is shown; and this is the question to be disposed of.

There are two patents in suit, both issued to the complainant, Louis W. Downes, one February 26, 1895, and the other, September 16, 1902; the second being merely an improvement on the first. Both are for a method or process of applying asbestos insulation to electrical conductors, particularly the wires of armatures and field coils; and, as an article of manufacture, the product resulting therefrom. Magnetic wires have necessarily to be small, and the insulation upon them as thin as possible in order to economize space. Among the recognized materials suitable for this purpose, silk is prohibitive on account of the cost; and cotton, which in many respects is valuable, eventually becomes carbonized by the heat generated by the electric current in the coils, thus losing its insulating quality and actually becoming a conductor instead, causing short-circuiting with its attendant evils. The possibilities residing in asbestos as an alternative, on account of its heat-resisting properties, were recognized prior to its use by the complainant, but the efforts in that direction, at least as to magnet wires do not seem to have met with success. The difficulty was to so apply the asbestos to the wire, that it would be at the same time compact,

evenly distributed, and thin; and this problem Mr. Downes as it is claimed, was the first to solve.

Speaking to the subject in the specification of the first patent, the inventor says:

"Heretofore asbestos insulation has been defective and unsuitable, * * * because, from the nature of the substance, it is extremely difficult to apply it to the wire in a compact, uniform, and sufficiently thin coating, and in a permanent manner. * * * It has been proposed * * * to apply an asbestos covering to a tube by weaving or braiding [as in a whip-braiding machine] strands of asbestos fiber around a wire, but such procedure has not been found successful in practice because the asbestos fibers are short and brittle, and the covering is easily abraided, and detached from the wire in handling and in use. * * * The object of the present invention is to remove these difficulties, and to provide means for the manufacture of asbestos insulated conductors at small cost, and having properties requisite to admit of their use in armature windings, house wiring, and for like purposes."

Proceeding to describe the several steps in the process, he further says:

"According to my present invention the wire, after first being coated with a quick drying adhesive mixture, such as some form of gum, applied thereto by any suitable means, is covered with the asbestos fiber, wound spirally or otherwise thereon, by any suitable mechanism well known to those familiar with the art. The wire is then subjected to a finishing process consisting in, first, combing or brushing out the asbestos covering to remove all superfluous lumps, irregularities, etc., and laying the nap all in one direction; second, applying pressure to the covering whereby the fiber is matted together in a compact layer, the thickness being gradually reduced to a suitable point; third, applying a coating of a water-proofing and toughening compound, to protect the insulation from injury in handling, and to impart to it moisture-resisting properties. After these operations the conductor is preferably passed again between pressure rolls and drawn through dies to impart a soft finish and reduce the insulated conductor to an even diameter."

Referring to the carding, it is said:

"The brushing or carding of the asbestos fiber is an important step of the process and contributes largely to the excellence of the finished product, and it is mainly to admit of this operation being successfully performed that the wire is coated with adhesive substance before applying the asbestos fiber, since I have found it impracticable to raise the nap properly unless the fiber is applied to the wire by the aid of an adhesive material. I therefore desire," says the inventor in conclusion, "to cover broadly the improvement consisting in applying the fiber by means of an adhesive substance and brushing, carding, or raising the nap, irrespective of the precise mode for finishing the product."

Briefly summarized, the essential steps in the process, as so specified, would seem to be: (a) Coating the wire with an adhesive; (b) covering it with asbestos fiber wound spirally or otherwise thereon; (c) combing or brushing the asbestos, to remove lumps and irregularities, and lay the nap in one direction; (d) matting the fiber in order to reduce and compact it; (e) waterproofing it, to toughen and protect it; and, finally (f) passing it again through pressure rolls and dies to smooth and reduce it to an even diameter. It is asserted, however, that the manner of finishing the insulation after raising the nap may vary, without departing from the invention; and that some of the steps in

the process may be used without others. It is claimed for the finished product, as so manufactured, that it possesses characteristics which distinguish it from other insulated conductors, theretofore made or known; in that the covering is dense and compact; the fibers matted or felted together, and adhering closely to the wire; the surface smooth and uniform; and the covering very thin—the latter characteristic, as is pointed out, being of great importance in windings for armatures and field coils. These qualities are due, as it is said, to the napping and compressing of the fiber, by which a tough, dense, and coherent fabric is produced, as distinguished from one with a series of coils or strands, with more or less space between them and having an inherent tendency to separate or spread. Upon this, the following claims are formulated, which are relied upon here:

"(1) The described process of applying a fibrous insulating covering, such as asbestos, to an electrical conductor, which process consists in coating the conductor with an adhesive substance, wrapping or winding the fiber thereon, brushing or carding the latter to raise a nap, and then pressing or compacting the fiber, substantially as set forth.

"(2) In the manufacture of insulated electrical conductors, the improvement which consists in applying a fibrous covering of asbestos to the wire, brushing the fiber in one direction, and compressing and reducing it to a smooth surface and uniform diameter, substantially as described."

"(8) As an article of manufacture, an electrical conductor having a compact, uniform covering of asbestos fiber, wound spirally thereon, matted, compressed and water-proofed substantially as described."

"(9) As an article of manufacture, an electrical conductor having a thin, compact, uniform covering of asbestos fiber wound thereon and attached by adhesive substance, the fibers being matted and compressed into a coherent fabric, substantially as described.

There can be no question as to the utility of this invention, or the advance made by it in the art of electrical insulation, particularly as applied to magnet wires. It may be attributed to the discovery that asbestos in a fleecy or flocculent condition can be manipulated in a way not possible with previous forms in use; the means adopted by the inventor for producing this condition being, by combing, brushing, or carding it, after it has been put upon, and made to adhere to the wire. This is of the essence of the process, the material, when so treated, being able to be matted and compacted together, in order to produce a uniform, coherent, and attenuated fabric, completely covering and insulating the wire. It is the resulting product, and the means by which it is produced, that are made the basis of the recited claims. There are generalities of expression in those with regard to the product, which, if unrestricted, would carry them far beyond this, embracing, for instance, any thin, compact, and uniform asbestos covering, glued to the wire, in which the fibers were matted, compressed and waterproofed, however brought about. But this broad construction will hardly be contended for; or, if it is, it cannot be sustained. Having regard to the prior art, as disclosed in the references cited, the invention, while a meritorious one, is not of an extended range. It was not new to provide, as a preliminary, that the wire should be coated with an adhesive, a most obvious expedient (Herstman, 1859; Splitdorf, 1881; Strong, 1882; Reed, 1887; Splitdorf, 1888; Randall, 1893); nor to make use of asbestos as the insulating material, either in the form of a thread

(Shuster, 1879; Cornwall, 1881; Strong, 1882; Splitdorf, 1888; Johns, Jr., 1889), in fiber (Splitdorf, 1888), or in mixture (Cornwall, 1881; Kissel, 1887; Johns, Jr., July, 1889; Holcombe, 1890). The use of fibrous material in a fleecy or flocculent condition, as, for instance, raw carded cotton in sliver, was also known (Splitdorf, 1881; Cuttriss, 1891; Randall, 1893; Robinson, 1894); and the matting or felting of the same into a compact mass (Cuttriss, 1891); as well as the compressing, reducing, and smoothing it, by means of dies, rollers, spring fingers, or other similar devices (Gilpin, 1883; Habirshaw, 1886; Holcombe, 1890; Cuttriss, 1891; Buckner, 1892); and finally covering it with a waterproof protection (Shuster, 1879; Cornwall, 1881; Cowles, 1883). It may be that several of these references apply to the insulation of other than magnet wires; but they cannot be separated on that account, in this consideration, all of them belonging, as they do, to the same general art.

This review, while it develops no direct anticipation of the complainant's invention, serves to disclose that which of necessity is its essential and distinguishing feature. No doubt the process which he devised is not to be found in anything which had preceded it; yet, with the one exception of carding the insulating material after it has been glued to the conducting wire, every other step in it, and more or less in the same order, is. It is in this, and in the matting and compacting obtained as a result therefrom, that the novelty as well as the merit of the invention resided; and to this, as set out in the specifications and claims, the complainant as a consequence is confined. According to what is there stated, he brushes or combs the asbestos after it is fastened upon the wire, getting it into a fleecy condition superficially, preparatory to its being matted and compacted again, in the way described, to which in that state it lends itself in a way that it would not otherwise. It is possible that this combing or carding may be made down to the wire, if desired; and also be given a spiral form, according to the apparatus devised and patented by the same inventor, about the same time. But whatever its extent, and however brought about, it is, in strictness, the arising of a pilous surface, or napping as it is expressly denominated in both patents, and its place in the process is definitely fixed as after and not before the material has been applied to the wire.

It is a grave question also whether the invention is not confined for material to asbestos thread or yarn. It is true, that fiber, in general terms, is spoken of, both in the specifications and claims. But it is evident from both that fiber in this particular form is what is contemplated, and, in at least one place, thread is expressly mentioned in the first, as it is also in the second patent, founded on the same process. It is in the argument of counsel, however, when the application was under consideration by the Commissioner of Patents, that the use of a yarn is particularly emphasized. Distinguishing the second Splitdorf patent, in which asbestos in the form of an untwisted, spread, and flattened thread, is employed, the practicability of this on account of the character of asbestos fiber is questioned; and it is at the same time pointed out, that, in the form of yarn, which it is plainly intimated is intended to be used, it has a very different struc-

ture and effect. The characteristic advantages of the inventor's product, it is further declared, are due "to the application of the spirally wound thread, the napping or carding, and the compression or matting"; each of which, it is said, contributes and is essential to the result obtained; the thread spirally wound being thus put on a par with the rest. Disclaiming in this way as impracticable, the use of asbestos in any other shape than a thread, and contending for especial advantages to be derived therefrom, it hardly lies with the complainant to now claim, that the invention is broad enough to cover asbestos fiber in whatever form applied.

Without passing definitely, however, upon this point, and assuming for the sake of argument that, except for what has been so alluded to, the particular form or condition in which the asbestos is to be applied to the wire is left open and unspecified; it by no means follows that this preliminary step in the process can be made interchangeable with others which come later on. It is after the conductor has been coated with the adhesive, and the asbestos has been wrapped about and made to adhere to it, that it is subjected to the combing, brushing, or carding, which is provided for, and the compressing, compacting, smoothing, and reducing, which follow on. Nor is there a suggestion that the order which is so arranged may be reversed, by which the asbestos for instance may be combed or carded first, and then applied. On the contrary, it is expressly declared in the specifications, that it is mainly to admit of this operation being successfully performed, that the wire is coated with the adhesive before applying the asbestos, it having been found impracticable as the inventor affirms, to raise the nap properly unless this course is pursued. The manner of wrapping the wire as well as of finishing the product, is carefully reserved in the specifications, and some of the steps in the process, as it is said, may be omitted; but not this. Having regard to the function, moreover, which is assigned to the combing or brushing, the order cannot be transposed. Not only is the purpose of it to remove lumps or irregularities and lay the nap or fiber all one way, but admittedly, also, to produce a fleecy, flocculent, or yielding surface, preparatory, and essential to matting and compacting it; which, of itself, presupposes a constituent material already on the wire to be so operated upon.

This brings us to a consideration of the defendants' process; some points of which have been necessarily touched upon, in what has been so discussed. It follows, in the main, the patent issued to John Allen Heany, September 29, 1903, which was the culmination of a number of patents by the same inventor, seeking to work out similar ideas. By this, asbestos in filmy flakes, like raw cotton sliver, is fed from a hopper, by means of a traveling belt in the form of a toothed conveyor, to a revolving and advancing wire, previously coated with an adhesive, by which the films are taken up and wrapped spirally about it. After being somewhat compressed together, it is then passed into a hot chemical bath composed of various ingredients which converts the asbestos into, or gives it the character of, a paint or paste; in which pasty condition it is run through a number of spring pressed dies which scrape off the superfluous parts of the mixture, gradually

reducing it to the desired thickness; and, after being subjected to the action of squeeze rollers by which it is still further compacted together—or, without this action—it is passed over a flame to bake and harden it; and finally it is put through smoothing rollers to give it an exterior finish.

There is, undoubtedly, in this process, a correspondence in some respects with the complainant's invention. The same insulating material, asbestos, is employed; it is united to the wire by means of an adhesive, previously applied; advantage is taken of the fleecy or flocculent condition of the material, to secure uniformity, compactness. and cohesion; and finally, pressure is made use of, not only to reduce, but to mat and compact, the insulation. The chemical bath, to which the asbestos is subjected, may also be regarded as supplying a waterproof coating. But with this, the resemblance ceases, the two processes in other respects being materially different. Most marked, in the defendants' case, there is no brushing or carding, which with the complainant is an essential and controlling feature. The defendants, as we have seen, make use of asbestos fiber in a filmy condition like cotton sliver. Whether it is reduced from the raw into this form by themselves or is manufactured by others, from whom they purchase, is not material; nor, that, in the reduction, carding may be employed. The point is that all this is done before the process begins, and is no part of it. The asbestos, for all that it matters, might be prepared in China. And it is essential, that it should be prepared somewhere, before it is put into the hopper, which is the start. Neither, in strictness, is the belt conveyor, by which the fiber is taken up and fed to the wire, a carding device, nor intended to operate as one; or, at least, not in the manner contemplated in the patent. It is true, that it is armed with teeth like a comb or card, which catch up the fiber and carry it in fleecy flakes or films to the wire; and it may be that these are drawn out and made to lie in one way, in the process. And if, in one sense, this is in the nature of a combing or carding, it is not of the character provided for in the patent, which, as we have seen, is not only to remove lumps and irregularities (which in the defendants' case has already been done in the manufacture); or to lay the films all in the same direction (in which respect there may be a coincidence); but, as a preliminary to this, to raise a nap or pile on the surface, by teaseling or drawing out the fiber. This in the complainant's process is the one predominant and significant feature, upon which the others, following it, hang. And, as pointed out above, it comes of necessity after the material has been put upon the wire, on which it depends, and which it contemplates and presupposes. Neither in the complainant's process, is any counterpart to be found for the chemical bath, which appears in that of the defendants'. It is possible, as already suggested, that this may have a hardening and waterproofing effect, but only incidentally and indirectly, and can hardly be made to take the place of the final exterior coating provided for in the patent. And while, if in other respects similar, the introduction of this additional feature might not avoid infringement, as the case stands, the two processes being otherwise materially different, it serves to emphasize the distinction between them. While then,

speaking broadly, both processes may utilize the same general idea, that asbestos in a fleecy condition, wrapped about and glued to a wire, may be compressed and matted together, so as to form a thin and closely compacted insulation, such as is required for magnet wires; yet neither appropriates the whole of it, and each goes about to develop it differently. The defendants give prominence to the manner of applying the material (left open in the patent), and the condition in which it is applied, having already been reduced to a flocculent form; the complainant, to the manner of manipulating it afterwards, by napping or carding, so as to produce a fleecy surface suitable to be operated upon; and both differ in the way the material is applied, as well as in its subsequent treatment, which are not interchangeable, and must be severally and respectively followed.

At this point the second patent issued to the complainant September 16, 1902, may be appropriately considered. As an improvement upon the first, the essential steps of which it adopts, if the defendants do not infringe upon the one, neither is it to be expected that they will be found to do so upon the other. The advantages supposed to be secured by the improvements introduced are best stated in the words of the inventor:

"While the inventions of my previous patents [enumerating them] relating to processes and machines, adapted * * * for coating metallic conductors with asbestos insulation have been quite successful in accomplishing these results [referring to certain results, which he has just spoken of], extensive experiment and investigation have disclosed difficulties which have at least tended to retard the industrial extension of the use of the asbestos insulated conductors produced according to said inventions. These difficulties consist in the injury done occasionally to the asbestos insulation in the carding and rolling thereof, particularly in the rolling, as the rolls quite frequently become clogged, and, catching the asbestos yarn, tear it from the wire. * * * This difficulty is largely due to the fact that the rolls in order to make contact with the periphery of the covered wire must be of extremely small diameter. * * * After extensive experiments, I have succeeded in avoiding the difficulties above referred to by my present invention; the principal feature of which consists in subjecting the asbestos insulation to pressure alternately applied and released. This pressure is preferably applied in the form of a rapid succession of blows uniformly distributed over the entire surface of the insulation and acting to beat down and compress the same against the wire, or, in other words, the asbestos insulation is swaged or subjected to a swaging operation analogous to that employed in the working of metals."

It is not necessary to quote further, nor to set forth the claims in which the invention is expressed, the first, second, third, sixth, eighth, and ninth being those which are relied upon:

"(1) The herein-described process of producing insulated electrical conductors consisting in covering the conductor with a suitable insulating material and subjecting the insulation to pressure alternately applied and released, thereby compacting the insulation on the conductor.

"(2) The herein-described process of producing insulated electrical conductors consisting in covering the conductor with a suitable insulating material and subjecting the insulation to pressure alternately applied and released in rapid succession, thereby compacting the insulation on the conductor.

"(3) The herein-described process of producing insulated electrical conductors consisting in covering the conductor with a suitable insulating material, and subjecting the insulation to pressure alternately applied and re-

leased in rapid succession; the application of the pressure being equally distributed over the entire surface of the insulation, thereby uniformly compacting the insulation on the conductor."

"(6) The process of producing insulated electrical conductors consisting in applying an adhesive substance to a conductor, covering the conductor with a suitable insulating material, and subjecting the covered conductor to pressure alternately applied and released in rapid succession, thereby compacting the insulation on the conductor."

"(8) The process of producing insulated electrical conductors consisting in applying an adhesive substance to a conductor, covering the conductor with a suitable insulating material, napping the insulating covering to remove irregularities and lay the nap all in one direction, and subjecting the covered conductor to pressure alternately applied and released in rapid succession, thereby compacting the insulation on the conductor.

"(9) The process of producing insulated electrical conductors consisting in covering the conductor with a suitable insulating material, moistening the insulation and subjecting the covered conductor to pressure alternately applied and released in rapid succession, thereby compacting the insulation on the conductor."

Some of these, as they stand, if not all of them except the last two, are so broad as to be of doubtful validity, from which they are only to be relieved by reading into them from the specifications the steps which they present in the barest outline. But without stopping upon this, the one feature common to them all is the subjecting of the insulating material to pressure alternately applied and released, by which it is compacted on the wire; which if the defendants' process does not show, it does not infringe.

The principal subject of complaint upon this score seems to be the succession of dies in use in the defendants' machines, through which the wire is carried after it leaves the chemical bath. These dies are some 8 or 10 in number, strung along one after the other, which alternately compress and release the material, as it is claimed, and thus fulfill the terms of the patent. The part, however, which they are intended to play is evidently not of this character. They are simply designed to strip off the superfluous material, which comes to them in a pasty condition, gradually narrowing and smoothing it down, until it is reduced to the required dimension. They are spring pressed in order to be yielding, and to try to make out of this an intermittent applying and releasing of pressure seems to me fanciful. That they tend to a certain extent to compress and compact the material may be conceded; but the same would be true of a simple scraping device, to claim which as an infringement would be absurd. It is, however, further contended that the material, being passed between compression rollers, which are succeeded at an interval by squeeze rollers, a case is presented of pressure alternately applied and released. In actual practice, a spring pressed die like the others, in advance of the bath, is substituted for the compression rollers; and the squeeze rollers, while shown in the patent, are entirely dispensed with. But, assuming the other construction, while, abstractly, a case such as is contended for may be thereby made out, clearly not one within the meaning of the patent. The reference to the swaging of metals shows this, if nothing more. As stated in the specifications, "a rapid succession of blows, uniformly distributed over the entire surface of the insulation, and acting to beat down and compress the

144 F.—8

same against the wire," is the action contemplated; and this, in substance, is to be found in all but the first claim. It does not apply to a simple passing through one or more compression devices, operating to gradually squeeze or narrow down the insulation without impact or blow, even though to a certain extent the pressure is relieved in between. Otherwise the first patent of the inventor anticipates and invalidates his second, to say nothing of other references; it being there specified that after the brushing or carding has been accomplished the material is subjected to the action of a series of pressure rolls, two of which, in addition to the final smoothing or finishing rolls, are shown.

As to neither patent, therefore, if these views be correct, has infringement been made out. To sum up, at the cost of repetition; except as the two processes deal with the same subject, and have the same end in view—the insulation with asbestos of magnet wires— they are distinct and different, and both may stand. The nearest that they approach is in the matter of carding, if, indeed, it can be said that the defendants do in fact card. But even there, both in purpose and in order of performance they vary. Nor as to the latter is it a mere colorable inversion, but one growing out of the different ends to be attained. Other features also widen the divergence. If the principle of the complainant's invention was appropriated it might be different. But that this has been done, either in terms or in spirit, I am not persuaded.

And the bill must therefore be dismissed, with costs.

### On Rehearing.

Application is made for a rehearing, upon the ground that proper consideration has not been given to the product claims, the distinction between process and product, as it is contended, having been overlooked by the court; and that, as to the latter at least, upon any view, infringement must be found. But while there may have been no separate discussion of the product claims, with due respect it is submitted, that the distinction was not lost sight of, as suggested, and that, giving them the fullest consideration to which they are entitled, the result must be the same. As is pointed out in the opinion already rendered, it is the resultant product, obtained from the process of the complainant as patented, which, as an alleged new article of manufacture, is made the subject of claims 8 and 9. And if the process, which is described in the patent is not imitated by the defendants, as seems clear, it is difficult to see how the product can be, either. It may be that by generalities of expression the claims are made to cover more than this, and in terms extend to every thin compact and uniform asbestos covering attached by an adhesive to the wire; the fibers of which are matted, compressed, and waterproofed, however this may be produced. But if that be so, and if this construction is contended for, it cannot be sustained. It is so expressly declared in the opinion, and there is nothing which is now suggested that leads me in any respect to change my mind. The law sanctions no such sweeping appropriation in any art.

Nor, looking into the characteristics of the two insulations, can they be said to be the same. The defendants' product, like the process of which it is the outcome, may have a general similarity to that of the complainant. But that is all. Inherently they differ. Both, no doubt, have asbestos fiber as their foundation, but of this, whether in thread, or carded film, or sliver, neither can have a monopoly. Both also use an adhesive, with which to fasten the material to the wire, which is equally open. In both, the fiber is matted and compacted together; but they differ in the manner in which this is brought about, and this marks the real distinction between them. The one brushes or cards the fiber after it is fastened upon the wire, getting it into a flocculent condition superficially, by which it is able to be the more easily manipulated; and then proceeds to mat or compress it together, reducing it down to the required thickness, waterproofing and smoothing it. The other presents the fiber to the wire in filmy flakes, like cotton, which are caught up and wrapped spirally about it; and subjects the material in that condition to a chemical bath, which, if not changing its inherent character, transforms it into a pulp or paste; in which state it is molded into its final form, being reduced by being drawn through spring pressed dies, and dried and hardened by passing over a flame, and finally smoothed by compression rolls. The two products are thus only generally alike, the chemical bath, if nothing else, introducing a distinct and novel feature.

All this, in substance, is to be found in the former opinion and, except to show that it was not overlooked, it adds nothing to repeat it. Seeing no occasion, therefore, to vary from the views which were so expressed, and, on the contrary, being only the more confirmed therein, the petition for a rehearing is refused.